IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 09 CR 144 |
| v. ) | |
| ) | Judge Virginia M. Kendall |
| FERNANDO BENALCAZAR and ISRAEL ) | |
| MICHAEL ZYGMAN ) | |

## MEMORANDUM OPINION AND ORDER

On February 17, 2011, a jury convicted defendants Fernando Benalcazar ("Benalcazar") and Israel Michael Zygman ("Zygman") of participating in a tax fraud conspiracy. Benalcazar was found guilty of conspiracy (Count 1), wire fraud (Count 5), and mail fraud (Counts 22, 33, and 34), and Zygman of conspiracy (Count 1) and mail fraud (Counts 42-44). Benalcazar moves only for a new trial under Federal Rule of Criminal Procedure 33 and Zygman moves for both a new trial and a judgment of acquittal. For the following reasons, the Court denies Benalcazar's Motion for a New Trial and Zygman's Motions for Judgment of Acquittal or a New Trial.

## BACKGROUND

### I.    Overview of Scheme

Marvin Berkowitz ("Berkowitz") created and led a conspiracy to submit over 4,000 fraudulent federal and state tax returns. (R. 16, Superseding Indictment ¶ 3.) Berkowitz and his coconspirators filed tax returns that claimed over $26 million in IRS refunds and $17.8 million in state refunds. (*Id.*) The IRS actually issued over $2.2 million in refunds and various state departments of revenue issued over $2.8 million in refunds. (*Id.*)

Specifically, various defendants prepared over 3,500 false federal income tax forms and 500 false state returns. (*Id.* ¶ 4.) These returns were filed based on the names and social security

numbers of federal inmates and deceased individuals and included fictitious deductions, credits, and income. (*Id.*) The defendants arranged for the returns to be mailed to numerous addresses or directly deposited to bank accounts that members of the conspiracy controlled. (*Id.*¶ 6.) Defendants then transferred the refund checks through banks and currency exchanges and split up the proceeds among themselves. (*Id.*) Berkowitz and the other principal participants in the conspiracy pled guilty and two coconspirators, Benalcazar and Zygman, went to trial. Within the broader scheme, Benalcazar and Zygman were responsible for receiving and depositing refund checks through personal or corporate bank accounts and distributing the proceeds to Berkowitz, members of his family, and other participants in the conspiracy. (*Id.* ¶¶ 16, 22.)

## II.     Trial Testimony

Only Zygman challenges the sufficiency of the evidence against him at trial through a Rule 29 Judgment of Acquittal; Benalcazar's Motion for a New Trial depends on specific evidentiary and legal issues, not the factual adequacy of the evidence at trial. The Court will therefore primarily focus on the trial testimony concerning Zygman's role in the scheme.

### A.     Israel Michael Zygman

Berkowitz filed thousands of fictitious IRS and state tax returns falsely claiming refunds using the names and social security numbers of federal prisoners and deceased individuals. (Trial Tr. 562:2-4.) As part of the scheme Berkowitz arranged for some of the refund checks of certain prisoners to be mailed to North 23rd Street, McAllen, Texas, which was the address of Zygman's tailor shop; the parties stipulated to his fact. (Tr. 2124:15-2125:7) Government Exhibit Hatagan 1 also catalogued the numerous IRS and state tax claims that listed this address as the location to send

the refund checks. Upon receiving the refund checks, Zygman forwarded them to Berkowitz, who was living in Israel at the time. (Tr. 2005:9-18; 2006:10-20.)

As IRS agent Gerald Hatagan testified, Zygman also deposited refund checks primarily into three personal bank accounts: two from Alamo Bank of Texas, one ending in account number 6767 and the other ending in 1948; the third account was with Frost National Bank and ended in account number 1807. (Tr. 2018: 3-16.) Agent Hatagan reviewed the deposits going into these accounts and the disbursements going out. (Tr. 2018:17-2019:3.)

The 6767 Alamo Bank of Texas account was opened on November 8, 2004 and the first refund check was deposited into it on November 12. (Tr. 2020:2-4; 2024:17-20.) The checks that Zygman deposited into the account were not payable to him. (Tr. 2024:21-2025:1.) For example, from January 30, 2006 to March 13, 2006, Zygman deposited three checks that were all issued to a federal prisoner, Dwayne E. Jones, from Indiana, Iowa, and New Jersey departments of revenue. (Tr. 2032:1-2033:15.) From November 2004 until the last deposit into the Alamo 6767 account in April 2006, Zygman made deposits into the account totaling $111,571.05. (Tr. 2035:5-13.) Of this amount, $101,996.84 was from IRS and state refund checks issued to third parties. (Tr. 2035:10-13.)

Thomas Blake Bowen, an IRS special agent with the criminal investigation division, interviewed Zygman at his tailor shop on May 24, 2006. (Tr. 2001:12-25.) The purpose of the interview was to discuss with Zygman a number of refund checks that were sent to an address in Mission, Texas that was associated with Zygman. (Tr. 2004:10-16.) Agent Bowen told Zygman that he was investigating an illegal tax fraud scheme concerning illegal refund checks. (Tr. 2004:20-2005:8.) Zygman told Agent Bowen that he had forwarded tax mail and tax refund checks to Berkowitz in Israel "three to four times" but he was no longer doing so and had no plans in the future

to forward anything to Berkowitz. (Tr. 2007:12-16, 20-24; 2011:6-10.) Zygman never mentioned to Agent Bowen whether he had ever deposited any of the refund checks into his own bank accounts. (Tr. 2009:2-15.)

After the May 2006 interview with Agent Bowen, Zygman stopped making any deposits into the Alamo 6767 account and turned his attention to the Frost Bank 1807 account and a different Alamo account ending in 1948. (Tr. 2048:10-12; 2069:8-2070:17.) The first deposit into the Frost 1807 account was on July 17, 2006 in the amount of $2,882.72; Zygman withdrew this amount from the Alamo 6767 account on the same day and deposited it into the Frost 1807 one. (Tr. 2048:10-21.) From August 21, 2006 until December 10, 2007, Zygman deposited checks from the IRS and the following state departments of revenue: Alabama, Arizona, Georgia, Louisiana, Mississippi, New Jersey, New York, Oklahoma, and Virginia. (Tr. 2049:8-2052:24.) Agent Hatagan nicely summed up the deposit activity in the Frost Bank 1807 from its opening in July 17, 2006 to June 1, 2009, when the last check was deposited: "As to the deposit items that went into the account for that time period, we found there were 54 government checks that were issued in the names of other people. And of those 54, 47 of them were from state governments, and seven of them were issued by the United States Treasury. The amount of those 54 government checks was $149,321.96." (Tr. 2064:20-2065:1.) From July 20, 2006 to June 1, 2009 Zygman also made payments totaling $132,897.06 from the account to third parties for personal and business expenses, such as rent and car payments, dog grooming, and cash withdrawals. (Tr. 2057:4-2063:24; 2060:1-11.)

Moreover, Zygman used the Alamo 1948 account with increased regularity after the May 2006 meeting with Agent Bowen. (Tr. 2069:6-2070:17.) Zygman used this account similar to how he used the Frost Bank 1807 one; from February 27, 2006 to April 18, 2008, he deposited $21,840.29

in government checks that were not payable to him. (Tr. 2069:6-2071:5; 2074:7-9.) During this time period Zygman made $14,214.46 in withdrawals from the account for his personal benefit. (Tr. 2076:9-18.)

On May 21, 2009 Special Agent Scott Campbell and his partner interviewed Zygman, again at his tailor shop in McAllen, Texas. (Tr. 2055:14-17; 2093:15-22.) Zygman told the agents that following the May 2006 interview, when he received refund checks not addressed to him he gave them to the postal carrier or returned them to the post office. (Tr. 2097:7-12.) When the agents asked him about his bank accounts, he mentioned neither the two Alamo accounts nor the Frost National Bank one. (Tr. 2097: 13-22.)

### B.    Fernando Benalcazar

As discussed, Benalcazar does not challenge the sufficiency of the evidence at trial so the Court will only briefly address the trial testimony relevant to his role in the scheme. From about January 2004 through October 2005, Benalcazar opened nine bank accounts either in his name or in the name of Mi Casa Recovery, Mi Casa Developers, and Mi Casa Financial at Bank of America, Charter One, Citizens Bank & Trust, and Fifth Third Bank. That is, Benalcazar controlled addresses and bank accounts for Berkowitz and deposited over $1.8 million in government deposits into his accounts; hundreds of these checks, however, bounced so he had a total of over $1.5 million available for use in his accounts. (Tr. 1822:20-1824:13.) Benalcazar also helped another participant establish AZYG Corporation at Citizens Bank for the sole purpose of receiving direct deposits and tax refund checks. (Tr. 833:17-21; 841:25-842:23.)

Berkowitz described Benalcazar to another participant in the scheme as the person who "dealt with the money." (Tr. 408:6-409:3.) Berkowitz instructed participants in the scheme to receive

refund checks from the IRS or state departments of revenue and forward them on to an address that he provided; Benalcazar paid many of the participants, one of which was Tiffany Lachner, for this work from his Mi Casa Financial, Mi Casa Recovery, and Mi Casa Developers accounts. (Tr. 410:3-413:21.)

## STANDARD OF REVIEW

### I.     Motion for Judgment of Acquittal

A motion for judgment of acquittal under Rule 29 challenges the sufficiency of the evidence against a defendant. *See* Fed. R. Crim. P. 29 (requiring the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction"). In challenging the sufficiency of the evidence, Zygman "bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). Such a motion should be denied if, after viewing the evidence in the light most favorable to the Government, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hicks*, 368 F.3d 801, 804 (7th Cir.2004). A conviction entered after trial by jury should not be overturned unless "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir.2003); *United States v. Menting*, 166 F.3d 923, 928 (7th Cir.1999).

### II.     Motion for New Trial

A motion for a new trial under Rule 33(a) should be granted only if required "by the interest of justice." Fed. R. Crim. P. 33(a). Such motions should be granted sparingly and are only appropriate if "substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir.1989). A defendant is entitled

to a new trial only if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict. *See United States v. Berry*, 92 F.3d 597, 600 (7th Cir.1996).

## DISCUSSION

### I.   Ostrich Instruction

The Court gave the jury an ostrich instruction as part of the instruction defining "knowingly," which was on page 42 of the final jury instructions. The second paragraph of that instruction, which Zygman and Benalcazar challenge, states as follows:

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word. You may not conclude that a defendant had knowledge if he was merely negligent in not discovering the truth.

Both Zygman and Benalcazar do not dispute the accuracy of the instruction itself, but rather whether the facts of this case warranted giving this instruction in the first place.

For the purpose of establishing criminal intent, "deliberately avoiding knowledge of a criminal activity is the same thing as having actual knowledge of that activity." *United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir. 1986). The ostrich instruction embodies this concept by "inform[ing] the jury that a person may not escape criminal liability by pleading ignorance if he knows or strongly suspects he is involved in criminal dealings but deliberately avoids learning more exact information about the nature or extent of those dealings." *United States v. Rodriguez*, 929 F.2d 1224, 1227 (7th Cir. 1991). The ostrich instruction should be given where: (1) the defendant claims a lack of guilty knowledge, and (2) the government has offered evidence sufficient for a jury to conclude that the defendant "deliberately avoided learning the truth." *United States v. Carani*, 492

F.3d 867, 873 (7th Cir. 2007); *United States v. Carrillo*, 435 F.3d 767, 780 (7th Cir. 2006). Here, at trial both Zygman and Benalcazar claimed that they lacked knowledge of the illegal scheme, so the only issue before the Court is whether the government has presented sufficient evidence to meet element (2).

Evidence of deliberate avoidance falls within two groups: evidence of "overt physical acts," and evidence of "purely psychological avoidance, a cutting off of one's normal curiosity by an effort of will." *Carillo*, 435 F.3d at 780; *United States v. Stone*, 987 F.2d 469, 472 (7th Cir. 1993). The first group, where the defendant takes physical action to avoiding gaining criminal knowledge, usually involves a straightforward analysis. *See United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990); *United States v. Diaz*, 864 F.2d 544, 550 (7th Cir. 1988). This case, however, involves the second group of deliberate avoidance, namely psychological avoidance, and the distinction critical to this analysis is "between a defendant's mental effort of cutting off curiosity, which would support an ostrich instruction, and a defendant's simple lack of mental effort, or lack of curiosity, which would not support an ostrich instruction." *Carrillo*, 435 F.3d at 780.

Benalcazar argues that an ostrich instruction was inappropriate because the evidence at trial did not establish that he took "conscious steps" to avoid gaining criminal knowledge. But in a case of psychological avoidance such as this one, "[p]hysical acts and outward expressions by the defendant" are "not necessary for a jury to infer" deliberate avoidance. *Carani*, 492 F.3d at 873. Rather, the issue is whether, taking into account the "surrounding circumstances" and what the defendant knew, it was appropriate for the jury to conclude that the defendant was suspicious about the legality of his or her participation yet deliberately did not pursue this curiosity so as to avoid gaining criminal knowledge. *Carrillo*, 435 F.3d at 781 ("The focus is on what the defendant knew

and whether the defendant knew enough to support an inference that he or she remained deliberately ignorant of facts constituting criminal knowledge.").

Specifically, the ostrich instruction was appropriately given in *United States v. Black*, 530 F.3d 596, 604-05 (7th Cir. 2008), *rev'd on other grounds*, 130 S. Ct. 2963 (2010), when defendants received payments from a subsidiary of Hollinger even though they were not owed any management fees. The Seventh Circuit explained in a hypothetical that the ostrich instruction was necessary in a scenario similar to the one in this case:

> If you receive a check in the mail for $1 million that you have no reason to think you're entitled to, you cannot just deposit it and when prosecuted for theft say you didn't know you weren't entitled to the money—that it might have been a random gift from an eccentric billionaire. You would have strongly suspected that you weren't entitled to the money and you would therefore have had a duty to investigate. By shutting your eyes you tacitly confessed your all-but-certain knowledge that you were stealing the money.

*Id.* at 604. That is, where circumstantial evidence suggests that the defendant was aware of the illegal conduct but avoided gaining full knowledge of it, the ostrich instruction is proper. *See, e.g., United States v. Mabrook*, 301 F.3d 503, 508-09 (7th Cir. 2002) (ostrich instruction appropriate where defendant used false financial statements overstating company's net worth by tenfold and statements also indicated that the company produced 50,000 cases of product when it really produced only 1,000 cases); *United States v. Craig*, 178 F.3d 891, 897 (7th Cir. 1999) (ostrich instruction proper where defendant, employee of a beauty school, never asked questions and simply followed the orders of her supervisor to sign students' transcripts that she knew exaggerated the number of hours they attended the school so that they could obtain Pell grants); *United States v. Graffia*, 120 F.3d 706, 713 (7th Cir. 1997) (ostrich instruction required where balance sheet for shell corporation in fraudulent scheme listed over $4 billion in assets and only $43,000 in liabilities because this was

"strong evidence" that it was not a legitimate bank and defendants were required to investigate further).

Here, Zygman received and deposited into the Alamo 6767 account over $100,000 in tax refund checks not issued to him. He met with IRS Agent Bowen in May 2006 and became aware of the ongoing investigation concerning the refund checks that he was receiving and forwarding on the Berkowitz in Israel. Zygman continued after this meeting to receive, send, and deposit refund checks but switched to two other accounts, presumably to avoid further detection. Throughout this time, Zygman made withdrawals to pay for personal expenses from these three bank accounts, which contained the deposited third party refund checks. Berkowitz allowed Zygman to take this money simply for following his instructions regarding receiving, forwarding and depositing refund checks. Just like the hypothetical in *Black*, when Zygman received thousands of checks from the IRS and state departments of revenue issued to third parties, there was a "strong suspiciion" that he was not entitled to the money and he had a duty to investigate the legality of the scheme. Because he "shut his eyes" and continued to receive and deposit the checks, even despite warnings from the IRS, the ostrich instruction was appropriate.

The same is true for Benalcazar. While Zygman used just personal bank accounts to carry out the scheme, Benalcazar used corporate bank accounts to hold over $1.5 million in tax refund checks that he received, all of which were not issued to him. As the evidence at trial established, the "businesses" Benalcazar created were not viable, functioning enterprises, but rather physical addresses to collect the refund checks. Benalcazar opened up about numerous corporate bank accounts and established addresses to receive the refund checks. Of the thousands of refund checks he deposited into these bank accounts, hundreds of checks bounced and three accounts were frozen

10

by Citizens Bank & Trust. He would send money from the refund checks to Berkowitz, keep a portion for himself, and pay other coconspirators for agreeing to receive the refund checks for Berkowitz. In sum, Benalcazar received checks issued to strangers, opened numerous bank accounts, paid other coconspirators, took a significant amount of money himself, created new addresses to receive the refund checks (i.e., rented various locations at which no legitimate business was conducted), and learned that hundreds of checks bounced and multiple bank accounts were frozen. The "circumstances surrounding" Benalcazar unquestionably justified the ostrich instruction because the jury could conclude that Benalcazar was suspicious of the legality of the scheme yet he consciously decided not to pursue this curiosity.

Finally, while the ostrich instruction should not be given "when the facts require the jury to make a 'binary choice' between 'actual knowledge' and 'complete innocence,'" this is not one of those cases. *See Giovannetti*, 919 F.2d at 1228. The question in *Giovannetti* was whether the defendant landlord knew that he was renting his house for the tenant to use for an illegal gambling operation; because there were no facts suggesting that the defendant deliberately avoided gaining this knowledge, the ostrich instruction was unnecessary and confusing. *Id.* Here, unlike *Giovannetti*, a wealth of evidence creates an inference that Zygman and Benalcazar made a mental decision to cut off their curiosity as to the legality of the scheme despite receiving clear signs about its illegality. *Cf. id.* (no active avoidance because it was not as if the rented house was on a thoroughfare that defendant had previously traveled on, then he went out of his way to avoid using that street after the alleged gambling activity started; no ostrich instruction because no evidence of physical or mental effort in shielding himself from the truth).

As such, the Court denies Benalcazar and Zygman's Motion for a New Trial because the ostrich instruction was appropriately given in this case.[1]

## II.    Israel Michael Zygman

Zygman moves for the Court to enter a judgment of acquittal, or in the alternative, grant him a new trial based on several alleged deficiencies in the jury instructions.

### A.    Judgment of Acquittal

Zygman contends that the evidence presented at trial was insufficient to support his convictions for conspiracy (Count 1) and mail fraud (Counts 42-44). Zygman's arguments in support of his motion are largely conclusory and do not address with any specificity how the government's evidence failed to prove beyond a reasonable doubt any of the essential elements for conspiracy or mail fraud. For example, Zygman claims that he is entitled to Rule 29 relief on the conspiracy count because the government did not show that he "knowingly" became a member of the conspiracy, that he "devised or participated" in a scheme to defraud, and that he had an intent to defraud. He submits no factual or legal argument, however, to support his argument. (R. 433 at 1-2.) His argument for the mail fraud counts is similarly defective; he claims, without elaboration, that the government failed to establish that he devised or participated in a scheme to defraud and that he acted knowingly and with the intent to defraud. (*Id.* at 2.)

### 1.    Conspiracy (Count 1)

Zygman was convicted of conspiracy to defraud the United States and various state departments of revenue in violation of 18 U.S.C. §§ 371, 1341, and 1343. To sustain a conviction

---

[1]  The Court also notes that there was sufficient evidence at trial to support a finding that Benalcazar and Zygman had actual knowledge that they were participating in a fraudulent scheme. *See Graffia*, 269 F.3d at 713 n. 5.

for conspiracy to defraud under 18 U.S.C. § 371, the government must prove beyond a reasonable doubt that: (1) there was an agreement to commit an act against the United States; (2) an overt act was done in furtherance of the conspiracy; and (3) the defendant knowingly participated in the conspiracy with the intention to further the conspiracy. *United States v. Wantuch*, 525 F.3d 505, 519 (7th Cir. 2008). Zygman challenges his conviction under Count 1 because the government failed to prove that he knowingly became a member of the conspiracy, that he devised or participated in a scheme to defraud the IRS and state tax agencies, and that he had the requisite intent to defraud. (R. 433 at 1-2.)

As an initial matter, there was substantial undisputed evidence about the nature of the criminal enterprise. Agent Hatagan testified in detail about the mechanics of the scheme: Berkowitz would file false tax returns using the stolen names and social security numbers of prisoners and dead individuals and arrange for the IRS or state departments of revenue to issue refund checks to a number of addresses held by other coconspirators, who upon receiving the checks would forward them on to Berkowitz in Israel or deposit them into personal or corporate bank accounts. (Tr. 461:6-491:11.) Testimony from other witnesses, such as Ania Zygman, Tiffany Lachner, and Larry Schweig further established the workings of the criminal conspiracy. Zygman never challenged the existence of the scheme at trial or now in his post-trial motion. Rather, he disputes whether the evidence established that he knowingly participated in the criminal conspiracy.

First, Zygman asserts that the government failed to prove that he "devised or participated in a scheme to defraud," but the overwhelming evidence establishes otherwise. In his Motion for Judgment of Acquittal Zygman never specifically explains how the government's evidence in this respect was lacking. Evidence at trial, however, showed that Berkowitz organized for refund checks

to be mailed to Zygman's tailor shop in McAllen, Texas. (Tr. 2124:15-2125:7; Government Ex. Hatagan 1.) Upon receiving the refund checks, Zygman mailed some to Berkowitz in Israel or deposited them into three personal banks accounts. (Tr. 2005:9-18; 2006:10-20; 2018: 3-16.) There was ample evidence of Zygman's participation in the scheme and his effort to challenge the sufficiency of this evidence fails.

The cornerstone of Zygman's defense at trial was that he lacked the necessary intent to join the conspiracy and defraud the IRS and state departments of revenue. His own actions, though, provided the jury with more than enough evidence to conclude that he knowingly became a member of the conspiracy and intended to further its criminal objectives. The evidence established that the jury could find that Zygman served a necessary role in picking up the refund checks, sending them to Berkowitz, and depositing them into personal bank accounts to use for his own personal benefit:

Take, for instance, the 6767 Alamo Bank of Texas account. Zygman deposited checks into this account that were not payable to him; in fact, from January 30, 2006 to March 13, 2006, he deposited three checks, all payable to federal prisoner Dwayne E. Jones, from Indiana, Iowa, and New Jersey departments of revenue. (Tr. 2024:21-2025:1; 2032:1-2033:15.) Zygman's use of this account to deposit refund checks was not marginal either. From November 2004 until April 2006, Zygman made deposits into this account of $111,571.05, and of this total amount $101,996.84 was from IRS and state tax refund checks issued to third parties. (Tr. 2035:5-13.)

The evidence further showed that after IRS Agent Bowen interviewed Zygman in May 2006 about an illegal tax fraud scheme involving illegal refund checks, Zygman promptly stopped using the Alamo 6767 account. (Tr. 2048:10-12.) In its place he began making deposits into a Frost 1807 account starting on July 17, 2006. (Tr. 2048:10-21.) From July 17, 2006 until June 1, 2009, as

Agent Hatagan explained, Zygman deposited 54 government checks that were issued to prisoners or dead individuals in the total amount of $149,321.96. (Tr. 2064:20-2065:1.) During this time period Zygman also used the account for personal and business expenses, such as rent and car payments, dog grooming, and cash withdrawals. (Tr. 2057:4-2063:24; 2060:1-11.) Zygman also used a Alamo 1948 more frequently after the May 2006 interview with Agent Bowen. (Tr. 2069:6-2070:17.) From February 27, 2006 to April 18, 2008, Zygman deposited $21,840.29 in government checks that were not payable to him and made $14,214.46 in withdrawals from this account for his personal benefit. (Tr. 2069:6-2071:5; 2074:7-9; 2076:9-18.) Finally, as established at trial, in an attempt to conceal the nature of the scheme, Zygman misled IRS agents about the quantity of checks he mailed to Berkowitz in Israel as well as his representation that he stopped working for Berkowitz in 2006. (Tr. 2007:12-16, 20-24; 2011:6-10; 2097:7-12.)

This collective evidence of Zygman receiving, depositing, and distributing check refunds, all issued in other peoples' names, is a more than adequate basis for the jury to find that he knowingly participated in the conspiracy.

### 2. Mail Fraud (Counts 42-44)

With respect to the mail fraud counts, Zygman only attacks the sufficiency of the government's evidence bearing on his knowledge of the scheme and his intent to defraud. The parties stipulated as follows to facts concerning Counts 42-44:

> On or about April 17th, 2009, the 2008 federal tax refund check in the amount of $6,086, in the name of Prisoner DD, with a Social Security number ending in 7369, as alleged in Count 42 of the superseding indictment, was delivered by the United States Postal Service to an address in McAllen, Texas, according to the directions thereon.

On or about December 19th, 2008, the 2007 federal tax refund check in the amount of $2,083.08, in the name of Prisoner EE, with a Social Security number ending in 2456, as alleged in Count 43 of the superseding indictment, was delivered by the United States Postal Service to an address in McAllen, Texas, according to the directions thereon.

Finally, on or about March 6th, 2009, the 2007 federal tax refund check in the amount of $5,013, in the name of Prisoner FF, with a Social Security number ending in 2002, as alleged in Count 44 of the superseding indictment, was delivered by the United States Postal Service to an address in McAllen, Texas, according to the directions thereon.

(Tr. 2124:15-2125:9.) Just like the conspiracy conviction, Zygman's assertion that the government presented insufficient evidence to support the mail fraud convictions is without specific factual or legal support. And as discussed, the government offered sufficient evidence bearing on Zygman's intent to participate in the criminal scheme.

Zygman fails to carry his "heavy, indeed, nearly insurmountable, burden" of showing that there is no evidence upon which a reasonable jury could find him guilty beyond a reasonable doubt of the conspiracy and mail fraud counts. *See Warren*, 593 F.3d at 546. The Court therefore denies his Motion for Judgment of Acquittal.

## B.     Motion for New Trial

Zygman asserts that he deserves a new trial because the jury instructions were either unnecessary or inaccurate statements of the law.

### 1.     Conspiracy Jury Instructions (pages 20-26)

Zygman generally argues that all of the conspiracy instructions on pages 20-26 of the final jury instructions were flawed. He fails, however, to provide any legal authority or facts to support his position.

The conspiracy instruction on page 20 tracked the language of the superseding indictment in laying out the two illegal objectives of the conspiracy: (1) to defraud the United States by impairing the IRS's ability to collect taxes; and (2) to devise or participate in a scheme to defraud the IRS and state departments of revenue of money and property by using false pretenses, and using mail or wire communications to carry out the scheme. There was overwhelming evidence during trial concerning the scope and functioning of the illegal scheme and such an instruction was appropriate to ensure that the jury found that the conspiracy was devised for an illegal purpose. The final paragraph of the instruction, which states that the government need only prove beyond a reasonable doubt that the conspiracy had one of these two illegal objectives, is an accurate statement of the law. *See United States v. Sababu*, 891 F.2d 1308, 1326 nn. 5-6 (7th Cir. 1989) ("[A] conspiracy conviction will be held as long as the evidence shows that the defendants agreed to commit at least one of the alleged objectives of the conspiracy."); *see also* Federal Criminal Jury Instructions of the Seventh Circuit 4.03 (1999) ("Pattern Jury Instruction"). Moreover, the instruction on page 21, which explains that the government had the burden to prove the two objectives of the conspiracy, is similarly valid, as Zygman has not challenged this particular instruction. The same is true for the instruction on page 23 that covers the time frame within with the defendants must have committed an overt act in furtherance of the conspiracy: Zygman's objection lacks support and there is no reason to believe the instruction was unnecessary or inaccurate.

Page 22 of the final jury instructions set forth the applicable law for finding that a defendant joined the conspiracy. The first paragraph explained that in determining whether the defendant joined the conspiracy the jury can consider the defendant's own words and acts, as well as the words

and acts of others that shed light on what the defendant did or said. The first paragraph of this instruction exactly mirrored an instruction set forth in the comments to Pattern Jury Instruction 5.08. An instruction very similar to the first paragraph was recommended by the Seventh Circuit in *United States v. Martinez de Ortiz*, 907 F.2d 629, 635 (7th Cir. 1990). *See United States v. Wantuch*, 05 CR 165 (Bucklo, J.) (final jury instructions page 22). In addition, the second paragraph of this instruction was taken directly from Pattern Instruction 5.08 and the third paragraph was added at the request of defendants, over the government's objection. (Tr. 2216:1-2217:1.)

The instruction on page 24 explained that the jury could consider the actions and statements of all the alleged participants in determining whether a conspiracy existed, and a conspiracy can exist even if its illegal purpose was never accomplished. This instruction was firmly rooted in Pattern Jury Instruction 5.08 and its comments, and Zygman has provided no specific basis undermining the accuracy of this instruction.

The law regarding whether a defendant joined a conspiracy was discussed with greater detail in the instruction on page 25. In sum, it stated that a formal agreement to conspire is not required, and as long as a defendant has knowledge of the conspiracy's "essential nature," he or she need not be aware of all the specific details of the conspiracy. Seventh Circuit precedent supports the instruction, and Zygman provides no controlling authority that calls into question this instruction. *See United States v. Spagnola*, 632 F.3d 981, 987 (7th Cir. 2011); *United States v. Haynes*, 582 F.3d 686, 698 (7th Cir. 2009); *United States v. Katalinich*, 113 F.3d 1475, 1483 (7th Cir. 1997). Similarly, the instruction on page 26 was also an accurate statement of the law that Zygman failed to challenge in any meaningful way. The page 26 instruction explained that each member of the conspiracy can perform distinct roles at different times and a single act is sufficient to make a

defendant a member of the conspiracy if this act creates a reasonable inference that he or she intended to participate in the illegal scheme. *See United States v. Gilmer*, 534 F.3d 696, 702-03 (7th Cir. 2008); *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003).

Finally, Zygman maintains that the Court erred by not giving his proposed jury instructions 14, 15, and 16 regarding the conspiracy count. Zygman's instruction 14 related to several separate conspiracies, but this case only involved a single conspiracy. (Tr. 2217:18-23.) This instruction was irrelevant to this case and would have misled the jury. With respect to Zygman's instruction 15, which addressed the framework the jury should use in deciding whether a defendant is a member of a conspiracy, Zygman's attorney stated "And, Judge, I would acknowledge that this instruction is inconsistent with current Seventh Circuit law, but I include it for preserving the issue for appeal." (Tr. 126:1-10.) Finally, Zygman's instruction 16 was already covered by the other instructions and was unnecessary.

As such, the conspiracy instructions accurately and clearly instructed the jury on what they should consider in evaluating the evidence against Zygman. His Motion for a New Trial based on the alleged deficiencies in the conspiracy instructions is therefore denied.

### 2.     Aiding and Abetting Instruction (page 44)

Zygman asserts that the aiding and abetting instruction given on page 44 of the final jury instructions is legally inaccurate and unnecessary given the testimony in the case. The instruction is taken directly from Pattern Instruction 5.06 and Zygman provides no specific basis to doubt its accuracy. Within the scheme, Zygman had a more minor role of accepting tax refund checks and either distributing them to Berkowitz or keeping them himself. Given the nature of the scheme and Zygman's necessary, but more limited, part within the conspiracy, the instruction was appropriate.

### 3.    Other Persons Mentioned at Trial Other than Defendants (page 17)

The jury instruction on page 17 explained to the jurors that they should not speculate as to why other persons who were mentioned during the trial were not defendants in the case.  This instruction was particularly useful in this case, where the leader of the scheme, Berkowitz, was not on trial because he pled guilty, and many other witnesses testified about their knowledge and role within the scheme but were not charged for their involvement.  In any event, disclosing to the jury whether a particular witness was charged is irrelevant to Zygman's participation in the conspiracy. *See United States v. Young*, 20 F.3d 758, 765 (7th Cir. 1994); *see, e.g., United States v. Henderson*, 08 CR 106 (Bucklo, J.) (final jury instructions page 18); *United States v. Hampton*, 03 CR 983 (Leinenweber, J.) (final jury instructions page 50).[2]

## III.    Fernando Benalcazar

In addition to the ostrich instruction, Benalcazar seeks a new trial based on four evidentiary rulings: (1) that he could not question other witnesses about whether they were unaware of Berkowitz's tax fraud scheme for the purpose of showing that Benalcazar also lacked that guilty knowledge; (2) that Benalcazar was barred from introducing Berkowitz's recorded statements giving Benalcazar false explanations as to the legitimacy of the scheme; (3) that Benalcazar was precluded from offering evidence that he cooperated with the government to show his innocent state of mind; and (4) that the government could introduce evidence that Benalcazar never filed any tax returns during the time that he was involved in Berkowitz's scheme.

---

[2] The remaining grounds upon which Zygman seeks a new trial are undeveloped and therefore waived. (R. 433, ¶¶ 7-13.)  The Court will not address these arguments.  *United States v. Williams*, 877 F.2d 516, 519 (7th Cir. 1989) (failure to identify any facts to support an argument imposes an impermissible burden on the Court to search the entire record on its own so such undeveloped arguments are waived).

### A.    Other Witnesses' Lack of Knowledge as Circumstantial Evidence of Benalcazar's Lack of Knowledge

Benalcazar intended to introduce evidence of other witnesses' lack of knowledge as to the legality of the scheme to serve as circumstantial evidence that he also lacked the necessary knowledge.  The Court disallowed such testimony because one person's state of mind is irrelevant to what another person actually believed.  Benalcazar challenges this ruling from two angles: (1) it is legally incorrect; and (2) the government waived its ability to object to this evidence.

A witnesses' subjective belief about the legality of his or her conduct is irrelevant to Benalcazar's knowledge or intent.  In *United States v. Kaplan*, 490 F.3d 110, 120 (2d Cir. 2007), for example, the case that Benalcazar primarily relies upon, the Second Circuit explained that a witnesses' criminal intent is of "little relevance" to the defendant's criminal intent.[3]  Such evidence is of "minimal probative value" in the absence of credible evidence that connects the witnesses' state of mind to the defendant, such as directly communicating that belief about the illegality of the scheme to the defendant.  *Id.* at 120-21.  In addition, "evidence regarding the knowledge of individuals other than the defendant should be admitted only if there is some other evidence in the record—concerning, for example, the nature of the fraud or the relationship of the parties—from which to conclude that the defendant would have the same knowledge."  *Id.* at 120.

Here, the Court acknowledged in its ruling that it would be a "whole different issue" if evidence emerged showing that the witnesses actually conveyed their belief about the illegality of the scheme directly to Benalcazar.  (Tr. 12:24-13:2.)  The Court also indicated that it would readdress this issue if it emerged during trial.  Benalcazar, however, provided no indication when

---

[3]  While *Kaplan* involved the reverse scenario as this case because the government tried to impute a cooperating witnesses' criminal intent to the defendant, the relevancy concept applies equally in both cases.

the Court ruled on this motion that any of the witnesses that he intended to call made such a communication to Benalcazar. Moreover, he does not identify in his filings now that during the course of trial it became necessary to modify the initial ruling to account for evidence that witnesses conveyed their beliefs about the illegality of the scheme to him.

Benalcazar also argues that the nature of the scheme and the fact the he did the "same work" as the other witnesses supports the conclusion that he had the same knowledge as the witnesses. While Benalcazar and other witnesses received, forwarded, and deposited refund checks, Benalcazar's involvement was more extensive than many others; after all, he controlled nine bank accounts, accepted mail at six different addresses, and was known to others in the scheme as the one who "dealt" with the money. Benalcazar's contention that many members of the conspiracy received and deposited refund checks and therefore they had knowledge similar to Benalcazar as to the illegality of the scheme is invalid; there is an inadequate foundation to show any connection between the witnesses' knowledge and Benalcazar's knowledge. In other words, beyond sharing general duties in advancing the conspiracy, there is no evidence that Benalcazar had such a close relationship with any of the witnesses to suggest that he shared the same lack of criminal intent that they did. *Cf. United States v. Kozeny*, 643 F. Supp. 2d 415, 423 (S.D. N.Y. 2009). Moreover, *United States v. Martin*, 408 F.2d 949, 954 (7th Cir. 1969), is equally unavailing because the Seventh Circuit did not address whether a defendant could argue that he or she lacked knowledge because similar witnesses did also; instead, it held there was sufficient direct and circumstantial evidence to establish that defendants had "knowing and fraudulent intent."[4]

---

[4] Benalcazar challenges the Court's limiting instruction after Ania Zygman's deposition testimony indicating to the jury that one witnesses' state of mind is not relevant to Benalcazar's state of mind. (R. 435 at 11.) This instruction was proper for the same reasons already discussed.

Finally, in Ania Zygman's Rule 15 deposition, when the other codefendants, including Berkowitz had not yet pled guilty, the government did not object to questions concerning her state of mind. Benalcazar asserts that this constitutes waiver of this line of questioning for all witnesses. The Court concluded that waiver applied to Zygman's testimony but not that of the other witnesses. (Tr. 15:14-15.) As discussed, to allow this line of questioning for all witnesses would have confused the jury and was entirely lacking in probative value. Further, Benalcazar fails to provide authority to support the proposition that the government's waiver during a deposition early in the case as to one witness applies to every subsequent witness, even if the counts and defendants remaining at trial have drastically changed the landscape of the case.

There was no error of law that jeopardized Benalcazar's rights, nor did he suffer any prejudice from the Court's rulings with respect to barring evidence of the state of mind of other witnesses.

### B.    Calls With Berkowitz That Benalcazar Recorded While Cooperating

While cooperating for the government for four months starting in May 2006, Benalcazar agreed to record certain conversations that he had with Berkowitz. He moved to admit these conversations, in which Berkowitz provided numerous false explanations about the scheme. The Court ruled that Benalcazar could not play the tapes because they had minimal probative value and lacked any indicia of reliability because the statements on the tapes were made under contrived circumstances. (Tr. 10:21-22.)

Benalcazar wanted to use the recorded statements obtained while he was cooperating in May 2006, where Berkowitz reassured him that the scheme was legal, to show that Berkowitz likely made similar statements to Benalcazar while the conspiracy was ongoing. Because this issue overlaps with

whether evidence of Benalcazar's cooperation is admissible, the Court adopts its analysis here. *See supra* Section III.C. Moreover, the recorded calls between Benalcazar and Berkowitz were made under contrived circumstances because both Benalcazar and Berkowitz knew that the government had interviewed other participants and was investigating the scheme. Any false explanations or reassurances that Berkowitz gave to Benalcazar, and any self-serving exculpatory statements that Benalcazar conveyed to Berkowitz lack any indicia of reliability. In fact, because both parties had a motive to fabricate during these conversations, there is no reliable basis to believe that these statements reliably represent previous comments that Berkowitz made to Benalcazar during the course of the scheme.[5]

### C.     Benalcazar's Cooperation as Evidence of Innocent State of Mind

Benalcazar sought to introduce evidence that he agreed to cooperate with the government as evidence that he lacked criminal intent. The government approached Benalcazar in May 2006, informed him that they were investigating Berkowitz for tax fraud, and he agreed to cooperate by recording in-person meetings with other participants and allowing the government to search his computer and office files. The Court did not entirely foreclose Benalcazar from introducing evidence of this kind; he was permitted to question the IRS agent on whether he agreed to speak with the agents, whether he turned over his computer for them to review, and whether he allowed them to search his house. (Tr. 367:3-7.) The Court, however, barred other evidence of cooperation because Benalcazar's interactions with law enforcement, after he knew that an investigation of

---

[5] For this reason, Benalcazar's argument that these statements are admissible for the nonhearsay purpose that because Berkowitz said them in the recording it is likely that he said them previously to Benalcazar is unavailing. (Final Pretrial Conference Tr. 49:3-5.)

Berkowitz's scheme was underway, are irrelevant to his criminal intent and only serve to confuse the jury. (Tr. 360:16-361:15.)

As the Court recognized, a defendant's interaction with law enforcement agents, offered to negate criminal intent, is not only irrelevant but also confusing and misleading to the jury. This is especially true where, as here, the charges in the indictment only covered conduct before May 2006, when Benalcazar began to cooperate. *See United States v. Dinga*, 609 F.3d 904, 908-09 (7th Cir. 2010) (defendant's offer to take a polygraph test to show his innocent state of mind was "self-serving evidence" likely to mislead and confuse the jury); *United States v. Yoon*, 128 F.3d 515, 524-25 (7th Cir. 1997) (defendant's conduct of paying restitution after fraud was complete did not negate criminal intent and was "irrelevant to the issue of whether the evidence was sufficient to show that she knowingly participated in the fraud during its existence, and we do not consider it for such a purpose"); *see, e.g., United States v. Dowie*, Nos. 07–50069, 07–50072, 2010 WL 4904309, at *3 (9th Cir. Dec. 2, 2010) ("testimony and exhibits regarding [defendant's] post-conspiracy cooperation was of *little probative value* to his state of mind during the conspiracy") (emphasis added). Though *Dinga* involved some analysis unique to the reliability of polygraph tests, the essence of the reasoning applies here: Benalcazar's cooperation in this case is not a reliable indication of innocence, and it occurred under contrived circumstances where he had a motivation to lie to benefit himself. For this same reason, any cooperation after Benalcazar finished participating in the scheme is irrelevant to show he previously lacked criminal intent while participating in the conspiracy. And regardless, any marginal relevance was outweighed by the potential of this evidence to mislead and confuse the jury.

Finally, Benalcazar principally relies on *United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990), to support his position. In *Biaggi*, on the issue of defendant's knowledge, the credibility of the government witnesses was seriously in doubt, and it was "highly significant" that defendant "reject[ed] an offer of immunity on the ground that he is unaware of any wrongdoing about which he could testify." *Id.* at 691-92. The "probative force" of a defendant's rejection of an immunity offer, which would have protected the defendant from any criminal exposure, far outpaces Benalcazar's cooperation after being confronted by law enforcement agents. In fact, the cases cited above specifically note the marginal probative value of post-conspiracy cooperation. *Biaggi* is therefore factually different from this case.

The Court provided Benalcazar with the opportunity to introduce evidence that he agreed to speak with agents, turn over his computer, and consent to a search of his office, but did not allow additional cooperation evidence because it was irrelevant and likely to confuse the jury.

### D. Benalcazar's Failure to File Tax Returns While Working With Berkowitz

The Court overruled Benalcazar's motion in limine to bar references to his failure to file tax returns in the past. (Tr. 62:20-64:15.) The Court determined that because this was a tax fraud case, such evidence can be indicative of trying to conceal illegally obtained income. Nor is it overly prejudicial because Benalcazar reserved the ability to mitigate this evidence by showing that he had never filed tax returns, even long before he was involved in the conspiracy. (Tr. 64:4-15.) Benalcazar claims this ruling was in error.

First, Benalcazar asserts that this was impermissible "propensity evidence" under Federal Rule of Evidence 404(b). The Court, however, did not allow reference to the tax returns to show that because Benalcazar had violated the tax laws in the past he was more likely to do so in this case.

In fact, Rule 404(b) allows bad acts evidence not for "propensity" purposes as Benalcazar argues, but rather for nonpropensity purposes such as knowledge or intent. It is precisely for these nonpropensity purposes that the Court allowed this evidence: the failure to document his income in tax returns during the years that he participated in the scheme is relevant to his desire to conceal any ill-gotten profits as well as his knowledge of the scheme's illegality. *United States v. Briscoe*, 896 F.2d 1476, 1500 (7th Cir. 1990). Second, under Rule 403, this probative value outweighs any prejudicial effect because the Court allowed Benalcazar to introduce evidence that he had never in his life filed tax returns; this would have severely undermining any adverse inference that could be taken from his failure to file a return during the years of the conspiracy. The request for a new trial based on this ruling is therefore denied.

## CONCLUSION AND ORDER

For these reasons, Zygman's Motion for Judgment of Acquittal and a New Trial is denied. Benalcazar's Motion for a New Trial is also denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 29, 2011